Good morning, Your Honors. If it pleases the Court, my name is Richard Johnston. I'm here today on behalf of Ms. Rincon, the appellant. I'd like to reserve four minutes for rebuttal. At least I'll shoot for that. Please watch the clock. Thank you. I need to start with an apology to the Court and to counsel. I have a point I need to raise that, candidly, I should have caught sooner. I should have gotten in the reply brief, and I just missed it. I do apologize and beg the Court's indulgence, but I think it's sufficiently important I should raise it. It has to do with the administrative exemption from the overtime rules. The case I'd like to cite is Bothell, B-O-T-H. Have you served on the other party or given them another? I had a chance to advise counsel this morning before the argument, yes, and gave her the citations. Please, afterwards, provide the citation to the clerk. Surely, and if the Court please, I'd be happy to submit a letter brief, and I certainly wouldn't object to a brief from AFSCME as well on this topic. The case is Bothell, B-O-T-H-E-L-L v. Fays, P-H-A-S-E, Metrics, 299F3-1120. Say it again. 299F3-1120. The pin site would be 1129, and that's a Ninth Circuit 2002 decision. And there's a companion district court case, Smith v. Overland Contracting, Inc., coincidentally issued by the same magistrate judge we have in this case. 2013 Westlaw, sorry, 5513-595, and the pin site for that would be 17, and that's a Northern District, California case. What these cases stand for is the proposition that when we are evaluating whether an employee has discretion and independent judgment in her work, the regulations warn us to be careful not to confuse the application of skill with the exercise of discretion. And those are two different things. I think that has particular application here, because many of the features of Ms. Rincon's duties, which AFSCME argues are the exercise of discretion, in fact are the application of skill, but they don't involve discretion. When Ms. Rincon is interviewing targeted employees as an organizer, rating them on the one-to-five scale, trying to find out where they stand, she may have to bring to bear some skill and experience in deriving that information from these people, but she is not exercising discretion. That exercise is the application of skill. And the district court case, the Smith case, makes the point that if what you are doing, no matter how much skill you have to bring to bear, if what you are doing is essentially gathering facts and then applying to those facts a previously established set of standards. Roberts. Let's assume you're right. Let's assume that her job doesn't involve the exercise of discretion, but rather the exercise of skill. What difference does it make in this case? Well, it would be yet another genuine issue, Your Honor, that a jury would have to look at the facts and tell us, was she exercising skill, was she exercising discretion? Well, but let's assume there's a factual question about it. I'm just trying to figure out why in the end that makes a difference to your case. Because it means that she's not exercising judgment and independent discretion, and it therefore means that she's not subject to the administrative exemption from the overtime rules, and therefore her overtime claim would prevail. All other things would be established. That's what my question is. So this applies only to your Filsa claim? That's correct. It doesn't apply to any claim except your Filsa claim? That is correct, Your Honor. All right. Yes. Yes. Okay. Thank you. I appreciate the Court's indulgence for that. Beyond that, even though we're here in an employment law case, we're really here just today talking about the proper application of summary judgment standards. The district court, in all three of the areas that were raised, the essential functions question, the pretext retaliation issue, and the overtime issue, in all three areas, the district court ---- Well, let's go to the pretext retaliation issue. Yes. What's your evidence of pretext, other than proximity of the termination to the ---- to her filing in the EEOC? Anything else? The evidence of pretext is that starting in October of 2010, it was AFSCME's position that Ms. Rincon had a serious medical condition, a certified medical condition in the parlance of the CBA, which qualified her for the sick leave bank. AFSCME maintained that position into the spring of 2011. Ms. Harrison testified that as of March of 2011, she continued to think that Ms. Rincon had a certified medical need for the sick leave bank. No, but I'm asking what's the evidence of pretext? As I read this record, AFSCME, over the course of about the last six months to a year before your client is terminated, keeps saying, you either got to get medical clearance to come back at your job, and your job, as we define it, involves more than 40 hours a week, or you need to let us know that you want to do a different job. And they say that routinely over a long period of time. And after the last, just before the last time, or just after the last time they say it, I take it, your client files an EEOC complaint. And as I read your briefs, you say, well, the firing must have been in retaliation for the EEOC complaint or because of the proximity. But I don't see any other evidence of pretext here. They're very consistent, saying get a doctor's clearance or tell us you want to work a different job, but we can't have you work this job just 40 hours a week. So where's the, where's the pretext evidence? Well, indeed, we're not appealing a lot of the rulings about pretext. The specific adverse employment action that we say was retaliatory was the termination of her sick leave bank benefits. And as to that decision, what we have to say is that she had, she had, she had received more sick leave pay and benefits than, than she was contractually entitled to, wasn't she? No, Your Honor, there was no contractual limit on how much sick leave bank benefits she could get. But the rationale for saying she was no longer eligible for leave share was because she could work an 8-hour day. And you're saying that that, there's no basis for that ruling, so that somebody who could work an 8-hour day was no longer eligible for leave share? In the circumstances of this case, that's correct, because... How does that, how does that work? Yeah, so, so she could work an 8-hour day. She just couldn't do the union organizer job. And so leave share was for people who couldn't work an 8-hour day is the way I understood at least opposing counsel's argument. Well, that actually is not, there is no external standard, actually, that says how sick you have to be or how limited you have to be to get sick leave bank benefits. The CBA just says you have to have a certified medical need. I believe the word is with a doctor's attestation or a physician's attestation. And beyond that, it's silent. There is no external standard. What, what is evidence... I understand your position. It's a contract, it's a contract argument. Right. Which is that she's entitled to sick leave until they can find, until they put her in a job for 8 hours a day. But that's not a retaliation issue, is it? Well, I think... Their position was the contrary. Their position was once you can work 8 hours, you don't get sick leave. So why is, why is this a retaliation for filing the EEOC complaint? Why didn't they just, they were content to litigate that issue. Why, why is this a retaliation claim? Because for something going on over 6 months, AFSCME's position was that Ms. Rincon was indeed sufficiently ill, she had a certified medical need, and therefore qualified for sick leave bank benefits. But AFSCME's position was always, was always that they would, we'll put it this way, maybe they were more indulgent than they should have been. Not with respect to the sick leave bank. It is important, I think, to focus on that here because... But you're still looking at the temporal proximity. Right. And so we've said there has to be specific and substantial evidence. I don't think we've ever said that temporal proximity alone was sufficient to get, it might be sufficient for a prima facie case, but not to establish pretext, a genuine issue of material fact on pretext. So is there anything else besides temporal proximity? Yes, indeed there is, Your Honor. And again, AFSCME took the position for a long time that she had a certified medical need. In March of 2011, it asked her doctor for an update on her medical condition. He provided one. AFSCME itself said, well, that's very similar. It really doesn't change anything. You've got the same medical condition you've already had. On April 1st, they send her a letter that doesn't say that she's too well to qualify. It says, be careful, your sick leave bank benefits are about to exhaust. They're about to run out. You need to be careful. Not a word about her health status. Okay. But that's, I wanted to ask, there was a limit on sick leave benefits, was there not? No. There was not a contractual limit. The only limit had to do with how much, how many contributions her fellow workers saw fit to make. Right. Because she was getting benefits in effect by borrowing. Right. And they said, you're about to run out on that number. Well, that's the point. You're getting close to the end of it. There's no record evidence to support that, but even if it's true, what happened was 15 days later after they said that, the EEOC complaint is filed. And then after that, now all of a sudden, she's just too well to qualify for sick leave bank benefits. Same medical condition. Nothing's changed about her medical condition. But they move from, you're sick enough, but they may exhaust soon. And they don't make any actual threat that they're going to pull the plug or anything like that. They just advise her, be aware, you know, they may exhaust soon. EEOC complaint comes in, and then all of a sudden, with the same medical condition, she's just too well to qualify. Well, but you say there's no change. But the change is, on April 4th, they get a letter from her doctor that says she can come back to work, as long as you limit it to 8 hours. And they had a letter from the doctor back in October of 2010 that said she could work a 40-hour week. And that's the only difference between the two. And AFSCME itself said that those two things are, I believe the word was similar, but they're not materially different. She had the same medical condition all along, so far as AFSCME knew. Ms. Harrison testified at deposition that, based on what she knew, into March of 2010. So, as I understand your argument, and correct me if I'm wrong, there's evidence here, in addition to proximity, about retaliation. Because after October, when AFSCME could have said what it said in April, it didn't say so until April. We don't agree that they could have said that, Your Honor. Well, but they – what you're saying is the situation was exactly the same in October as it was in April. Right. So what you're saying, therefore, therefore, this must – her firing must have been a pretext for punishing her for filing an EEOC complaint, because if they were going to fire her, if they were going to fire her, they should have done it in October. Isn't that – that's really what you're saying, isn't it? No, it's not, Your Honor, because we do not agree that they could have appropriately terminated her. I know, but we're looking for retaliation. Right. So you're saying their position was, in October, you're ready to come back to work and you shouldn't get sick leave benefits anymore. No, no, no. That's the way you read it. To the contrary. And they didn't do that. To the contrary. In October, they said, you are sick enough to qualify for sick leave bank benefits, and they maintained that position. They never said she was well in October. Did they say that, or did they just continue to pay benefits? Well, they approved her claim for sick leave bank benefits based on the – Well, I understand. Based on the – based on the – You said they said – you said they said something, so I'm asking you a question. Their position was that she had a certified medical condition that qualified her for sick leave benefits. Ms. Harrison testified that that status quo continued into the spring of 2011, and the evidence of pretext is an otherwise inexplicable change in their position from you have a certified medical condition, but the benefits may soon exhaust, to sorry, you don't have a certified medical condition when her condition has not changed. I'm still asking the same question, and I know you want to save some time for rebuttal, but what you're really saying is if they weren't pretextual, then in October, when they got a letter identical to the letter, in your view, that they got in April, they should have said to her then, sorry, you're done, right? No, I don't think so. I don't think they should have said sorry, you're done at any point. That's the point. When they finally said it on May 31st of 2011, that was improper. She still qualified at that point for sick leave bank, at least based on a certified medical condition, and that's the – that's exactly the 180 they did that is otherwise inexplicable. And I would quibble a little bit with saying it must have been that. I mean, we're talking here about a summary judgment motion, and my point is that that is enough evidence that we have to have a jury tell us whether that was evidence of pretext or not. The Court's error was in taking that from the jury. I'm not saying ASTME doesn't have evidence on its side, and I'm not saying any of this evidence conclusively proves any part of the plaintiff's case, but we're here on a summary judgment appeal, and there are a lot of issues here that we need a jury's opinion on before we can properly figure out who prevails. Do you want to save the rest of your time for real life? I would. Thank you, Your Honor. We'll hear from ASTME. Good morning, Your Honor. To may it please the Court, my name is Kathleen Keller. I am here representing the Defendant AFSCME, Defendant Apele in this case. Sort of an unusual position for you to be opposing a worker. The unions function both as representatives of its bargaining unit members, but then also, of course, as employer with respect to their own employees, and always have the goal of the dual goal of treating its employees well at the Can you address why that's not a genuine issue, material fact, as to whether the change in the union's position as to whether she was eligible for leave share following the EEOC complaint being filed, why doesn't that create at least a genuine issue of material fact that the reason for terminating the leave share was pretextual? Certainly, Your Honor. To answer that question, I want to focus in back on the record. And the Plaintiffs' Council has focused on that April 15th EEOC filing, of course. But the key dates here really come before that April 15th filing. And the key dates are the March 22nd letter from Ms. Fincon's doctor, and then the April 1st response from the Human Resources Department. So on March 22nd, her doctor sends in a letter saying that Ms. Fincon can work but cannot work more than eight hours in a day. How is that letter different than what her doctor said in October? Well, it's a bit different. I mean, before it was not more than 40 hours in a week. Now it's not more than eight hours in a day. In some ways, not more than eight hours in a day is more restrictive when it comes to organizing work because you can often have a very long day. But I'm assuming that neither of those letters qualify her to go back to her old job, which is more than 40 hours a week. But after the first letter, you continue to run medical leave. And then the second letter, which seems to me not very distinguishable from the first, you say, okay, we've had enough, either come back or you get canned.  You're right, Your Honor. And I think what happens here is the March 22nd letter sort of prompts a reassessment in Human Resources. They get the letter. They do a reassessment. And that leads to the April 1st letter from Human Resources. And this is sort of the key document here. The April 1st letter says, if you can come back without that medical restriction, we've got an assignment in Michigan for you. We'd love to have you if you can get full medical clearance. If not, again, we invite you. There are other jobs in AFSCME that don't require those kinds of hours. Please look at the available jobs. See if there's something you can do. And then the letter goes on to say to ask her to provide more specific information about the anticipated duration of her condition, quote, so that we can determine if further extensions of your leave will allow you to return to work. They're saying if further extensions. Reading that carefully, it's clear that the gears are now in motion to put an end to this system of indefinite leave. But don't they also say in that letter that your leave share is close to exhaustion? That's correct. And is that the same as saying you're not eligible, or is that a different issue? Well, there's two issues for eligibility for the leave share. And one is that there has to be leave in the bank. They didn't make a determination that she was ineligible for leave share. They just said the leave share is close to exhaustion in the bank. Is that right? That's right. But in the April 1st letter, they're not plainly saying we don't think you're medically, that you have the medical necessity for the leave bank, but they are saying please give us the information about the anticipated duration so we can determine if further extensions will allow you to return to work. Explain to me, because I have difficulty calling it out of this record. Does an employee have a limit about how much medical leave she can take? No. Okay. So if somebody were ill for a longer period of time, they just continue to get medical leave? How does this work? I understand how the leave share works. You've got a bank that you're borrowing, in effect, from other people. But tell me how one exhausts their medical leave in total without regard to leave share. Well, there's not anything like a drop-dead date. And clearly AFSCME, like any other employer, has to make a determination at some point when you have an employee that is so ill that they're not reasonably ever going to be able to return to their work. At some point, the employer has to make a determination about what is the end game and how long does this go on. Okay. So let's go backwards. And I'm still not sure. And it may just be that AFSCME was unduly generous. But in October, you have a letter that says she can work eight hours a day, I think. And nonetheless, you continue her on some form of medical leave. And in March, you get a letter that says 40 hours a week, which to me is not very distinguishable. And then you say to her, put up or shut up, in effect. You know, either tell us you can come back more than 40 or look for another job. So I'm focusing on the difference in those two letters, those two actions. What's the difference between the two? I think one of the key points is the timing here. So in March of 2011, at this point, we're coming up on one full year that she's been out on leave. She went out March, I'm sorry, May 3rd of 2010 and started using the donated leave May 20th of 2010. So at this point, it's been very close to a year. And that's sort of the point at which AFSCME needs to reassess. They've got a position that they can't fill. They've got a dire need for an organizer. And they cannot fill the position so long as she's out on leave. And if you look back. Is there some hope at that time that she's going to be able eventually to come back to her full-time position? In other words, is AFSCME saying, we'll continue you on leave because you look like you're making progress. But at some point, we just have to have you back or move on? Well, the letters repeatedly say, if you can get the medical clearance, we'd like you back. Or if there's a different position that would be more suited for you within AFSCME, we'd like you to apply for that. One thing I would like to draw the Court's attention to is that basically the same thing had happened in 2007, where she was also out for a year's worth of medical leave. And just about approaching the one-year mark at that point, AFSCME sent a letter saying, we cannot continue to carry you in an indefinite leave of absence status due to operational needs. And advised her that the end of the road was in sight. And at that point, she did actually return to AFSCME for a period of some months and worked. And that's the Statement of Undisputed Facts, paragraph 16. It's also cited in our brief that that letter. So this is entirely consistent with what AFSCME has done in the past, that when you get to sort of that one-year mark, decisions have to be made, and the organization needs to figure out how it's going to move forward with this gap in its organizer team. What about the eligibility for leave share seems to be a different issue? So rather than saying this is long enough, either put up or shut up, they're saying you have lost your eligibility for leave share, and nothing had really changed. And they don't say it's exhausted. They just say you've lost your eligibility. And that came, a change in position on leave share came after the EEOC was filed, so complaint was filed. So how do we read that? Why was there a determination that she had lost her eligibility for leave share in the context, as you were describing it? It really was just a reassessment that was prompted by the March 22nd letter, that any time you get a new doctor's letter, there's going to be a reassessment within human resources. And at the time, I would note that at the time the October letter from the doctor came in, she had already been on leave share at that point for five months. And at that point, it didn't prompt a reassessment. I don't think anyone was thinking about it in those terms. But by the time the March letter came in, there was a reassessment as to, well, is she really eligible for this leave share when she's capable of doing other jobs within AFSCME, but simply won't apply for them? The April letter didn't talk about eligibility. It just talked about exhaustion. So they got the one year happens. They get the letter from the doctor saying eight hours. Then AFSCME says, not you're now ineligible, but your leave share is close to exhaustion. Then the EOC complaint is filed. And then the next letter says, oh, by the way, you're ineligible for leave share. That's the sequence of events I'm confused about. The sequence. What made her ineligible for leave share? It was the fact that she was capable of doing work, certainly within AFSCME, just not the organized. They knew that in April, right? They knew that for a year. But they knew that in April, that a year had gone by, and she was still getting release only for an eight-hour day, 40-hour week, whichever. But at that point, they don't say anything about you've lost your eligibility or that we're going to fire you if you don't show up for work or take another job. It isn't until after the EOC complaint is filed that they make the determination about eligibility. I agree that they could have terminated her leave bank usage back in October of 2010. That has to be your position, doesn't it? Yes. And the fact that they didn't do that either because, you know, human resources sort of thought about it through that lens at that point or because they were trying to be as generous as possible doesn't really bear on the question of whether that constitutes evidence of pretext for retaliatory animus. Explain why that doesn't create a genuine issue of material fact on pretext. And, again, I think it comes back to this April 1st letter, where it's clear that AFSCME is already moving, already has the gears in motion to resolve this issue. That this is really the fact that she's the fact that she has once again submitted a note saying that she can't do her job, that the prognosis is guarded, that the duration is unknown, that she's coming up on a year of being out, that these are the things that are prompting AFSCME to say at this point we need to come to a resolution on this position. The question at the core, I think, is could any reasonable finder of fact find that absent this EEOC charge, AFSCME would have allowed her to continue indefinite use of the paid donated leave bank? And the answer to that clearly has to be no. So let's go back between October and April. Tell me what communications AFSCME makes to Ms. Rincon to tell her the time is running out. Is there anything, or there's just the response in October and the letter in April? There were a series of letters, and I'm sorry. That's right. I'm trying to track that series of letters and see was your position consistent to those series of letters? It was consistent over the course of the year. And I'm sorry, I can't recall between October and March exactly what letters went out. There was the October letter from the doctor. I believe there were some letters between that and March when they asked her to. There was a letter that went out on March 3rd from AFSCME's Human Resources Department asking her to recertify her eligibility. And that's what prompted the March 22nd doctor letter. And I believe the March 3rd was just sort of an automatic kind of check-in letter. Of what relevance are the things that occurred on the first leave of absence, if you will, in 07? She leaves for a while, she's told things, she comes back to work, and then she again goes on leave. Does that course of conduct bear at all in our determination of whether there's a pretext here? It does, because it's consistent, it shows that AFSCME has sort of a consistent policy or a consistent practice, rather, of not allowing people to be out indefinitely, even if they have paid leave to use. It comes back to the question of would AFSCME have taken this same step absent the April 15th EEOC filing. And all the evidence, looking at the totality of the evidence here, is that yes, this is sort of AFSCME was following its usual standard, quite generous practices of allowing people to be out on leave, trying to work with them, trying to see if they could rehabilitate to the extent that they could come back to their organizing job, the job that they had previously, or if there was some other job that they could come back to. But at some point, that generosity has to come to an end in order to serve the organizational needs of the employer. Could you address just very briefly the essential function issue and why the evidence that Mr. Maggia could perform satisfactorily with fewer hours doesn't create a genuine issue of material fact as whether the extended hours were an essential function? Certainly. The evidence with respect to Mr. Maggia, if you actually go to the evidence in the record as opposed to what's said in the brief, is that there was never any sort of an agreement that he was going to be working an 8-hour schedule upon his return from leave. I didn't understand that part of your brief, because the question is not whether there was an agreement or whether AFSCME approved. The question is could he perform the jobs satisfactorily with fewer hours, because apparently he had off-the-book acknowledgement or concession that he was working fewer hours. The evidence was actually not that there was any sort of off-the-book acknowledgement that he would be working a limited day. What the evidence said is that, and this is from the 30B6 deponent, is that the supervisor allowed breaks as needed for a limited duration upon his return to work. So it would be sort of during the course of what was a long day, Mr. Maggia would say, I need a little bit of a break, and if his supervisor could accommodate that, he would. So there's absolutely no evidence that the supervisor, with or without HR's involvement, approved an 8-hour day. Scalia. Wasn't it the same job as Mr. Incon's job? For all intents and purposes. It may have been a different, you know, every organizing campaign is different and every organizing campaign is going to have its own flow and its own hours requirements, so it may have been a different organizing campaign. But for all intents and purposes, it was the same job. Thank you. Thank you. Your Honor, the overriding point I would want to make is that I think a lot of Ms. Keller's responses to the Court were the kind of thing one might argue to a jury, to explain why the jury should find things one way or the other. But in a case where every doubt has to go Ms. Rincon's way, where every reasonable inference has to be drawn in her favor, I just don't think this is a summary judgment case. It could be exactly as we heard Ms. Keller describe it. But there is evidence from which a reasonable jury could conclude that when that EEOC charge came in, all of a sudden asked me to decide, sorry, you're just not sick enough. Nothing else happened to explain that change of position. They didn't say, you know, it's been a year, we've got to cut bait. They didn't say that. They said, you're not sick enough anymore. And there's no explanation in the record for that other than the EEOC charge. Or at least that's got to be among the potential explanations, and that means a jury has to decide. I'd like to touch very briefly, if I could, on the essential function issue. I don't know if the Court is concerned or has questions about the admissibility or cognizability of the leave policy evidence, but I do think that's very strong evidence. One thing I'd like to point out that may not be clear in the record is that the collective bargaining agreement does have a provision that people coming back from parental leave can get two weeks of paid leave, followed by six months of unpaid leave. What is not in the CBA is this policy that asked me apparently did voluntarily is that when they come back for three months, they can work limited time. They can work three days a week. Asked me was not contractually compelled to do that. Ms. Harrison's testimony, which is in the record, is that, you know, when people come back from parental leave, we try to be as flexible as we can for them, and we let them work just three days a week, which is very generous. You know, there's a circuit that has said that an employer who voluntarily gives generous leave benefits forfeits their right to argue that that was an essential function. Your Honor, I do not know of a case that says that. I don't know of a case that says the opposite, either. There are cases that say the opposite. Well, we've made our point in the brief, I think, as well as I can make it here. But those cases aren't about leave policies. They're about an ad hoc temporary accommodation for one employee, and then saying you can't extrapolate from that to say, oh, well, essential functions are determined. Here we're talking about a generalized policy applicable to all organizers. Any of them who become a new parent get this very generous leave. It is not ad hoc, and it is not limited to any one person. Thank you. Thank you, Your Honor. Okay. The case of Rincon v. Apsamay is submitted.
judges: Ikuta, Hurwitz, Melloy